# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI CENTRAL DIVISION

LOUIS GATEWOOD,           )
                                    )
        Plaintiff,         )
                                    )
        v.                 )      Case No. 04-4319-CV-C-NKL
                                    )
COLUMBIA PUBLIC         )
SCHOOL DISTRICT,         )
                                    )
        Defendant.     )

## ORDER

Pending before the Court is Columbia Public School District's ("Columbia") Motion for Summary Judgment [Doc. # 53]. For the reasons set forth below, the Court grants in part and denies in part Columbia's Motion.

Also pending before the Court is Columbia's Motion to Strike [Doc. # 66] and Corrected Motion to Strike [Doc. # 71]. For the reasons set forth below, the Court denies both of Columbia's Motions to Strike.

Plaintiff Louis Gatewood ("Gatewood") also filed two motions that are pending before the Court. Gatewood moved to strike the affidavit of Dr. Mary Laffey [Doc. # 80] and the affidavit of Dr. Dana Clippard [Doc. # 81]. Columbia submitted both affidavits as part of its response to Gatewood's additional statement of facts. For the reasons set forth below, the Court denies both of Gatewood's Motions to Strike.

## I.    Motions to Strike

1

Case 2:04-cv-04319-NKL   Document 90   Filed 02/03/06   Page 1 of 48

**A.     Columbia's Motions [Docs. ## 66 and 71]**

In his Opposition to Columbia's Motion for Summary Judgment, Gatewood contested many of Columbia's material facts.  Gatewood's responses consist of twenty-seven pages.  However, Gatewood also submitted an additional set of facts to support his claim.  Gatewood's additional facts consisted of 182 paragraphs of factual assertions, many of which contained subparts.  Gatewood's additional facts were approximately sixty-eight pages in length.

In its Motions to Strike, Columbia requests that the Court strike all of Gatewood's additional facts submitted in opposition to Columbia's Motion for Summary Judgment. Columbia states that neither Fed. R. Civ. P. 56 nor the Local Rules of this Court authorize a defending plaintiff to submit additional facts.  Gatewood argues that additional facts are allowed because of a clause in Local Rule 56.1, which states: "All facts on which a motion or opposition is based shall be presented in accordance with Rule 56 of the Federal Rules of Civil Procedure."  L.R. 56.1.

Gatewood's format is not the preferred method of defending dispositive motions; particularly, where Gatewood had already presented a vigorous defense to the facts set forth in Columbia's Motion.  Presenting two sets of facts requires that the Court cross-reference the factual assertions and check them against each other, thereby requiring that the Court expend considerable time just trying to ferret out the basic facts of the case.  In fact, Gatewood's two statements of fact consistently cross-reference each other--a burdensome method for presenting facts to the Court.  Moreover, the length and scope of

2

Gatewood's additional facts is onerous and it does not seem that Gatewood attempted to distill any of the additional facts down to those which are truly necessary for resolving summary judgment. Instead, it appears that Gatewood literally threw in every fact possible.

Nonetheless, this Court has an interest in evaluating a dispositive motion in light of all the facts reasonably available to it. Similarly, a non-moving party has a right to present facts that are not encompassed in the moving party's motion that it believes supports its claim and refutes summary judgment. L.R. 56.1. Therefore, the Court will deny Columbia's Motions to Strike [Docs. ## 66 and 71].

## B. Gatewood's Motions [Docs. ## 80 and 81]

Gatewood in turn has moved to strike two affidavits that Columbia offered in its rebuttal to Gatewood's additional statement of facts. Gatewood challenges the affidavits on evidentiary grounds and he argues that the affidavits are beyond the scope of Columbia's original Motion. To the extent that Columbia's affidavits are beyond the scope of its original Motion, that is because Gatewood expanded the scope of the factual inquiry contained in the original Motion with its extensive additional statement of facts. In the interest of fairness, the Court will deny Gatewood's pending Motions to Strike.

## II. Background

The following factual overview contains both contested and uncontested facts.[1] To

---

[1]Columbia vigorously contests Gatewood's allegation that inappropriate racial comments were made and Gatewood's allegation that he made repeated complaints about racial

3

resolve the Motion for Summary Judgment, however, the Court has considered only those facts that are material and relevant, and the facts are viewed in the light most favorable to Gatewood when they are properly contested.

Gatewood is African-American. He began his employment with Columbia at the inception of the 2001-2002 academic school year. Gatewood was an Instructional Aide ("IA") at Bearfield Elementary School ("Bearfield"). During the relevant time period, Gatewood had received several hours of college education, but he had not completed his bachelor's degree. Gatewood was certified as a substitute teacher. Gatewood continued to be employed as an IA at Bearfield until the 2004-2005 school year when he voluntarily transferred to Field Elementary School.

During his tenure with Columbia, Gatewood received yearly increases in his hourly wage and he continues to be employed by Columbia. It is undisputed that Gatewood received positive work evaluations during the entire relevant time period, but for the minor mention of excessive absences.

During his stint at Bearfield, Gatewood reported directly to Russell Hardesty ("Hardesty") and Dale Wilkinson ("Wilkinson"). Hardesty was the principal/site administrator at Bearfield while Wilkinson was the staff psychologist at that facility. Columbia concedes that both Hardesty and Wilkinson had supervisory authority over Gatewood. When Hardesty was out of the building, it is undisputed that Wilkinson was

_____

discrimination to his supervisors. The Court, however, must look at the evidence in the light most favorable to Gatewood because he is the non-movant.

4

in charge. Both Hardesty and Wilkinson are Caucasian and they supervised Gatewood during the entire relevant time period.

Gatewood also interacted with numerous individuals who were not located at the Bearfield facility, but who oversaw broader operations for the Columbia School District. Gatewood interacted with Jacque Cowherd ("Cowherd") and Mary Laffey ("Laffey"). Cowherd was the Deputy Superintendent of Columbia and Laffey was the Director of Human Resources. Both Cowherd and Laffey are Caucasian and they held their respective positions during the entire relevant time period. Additionally, Gatewood had contact with Dana Clippard ("Clippard"). Clippard was the Director of Special Services for Columbia's Special Education Department. She is also Caucasian, but she did not begin her employment with Columbia until the 2003-2004 school year.

Bearfield is an alternative school for students who cannot function in a normal, mainstream educational setting. The vast majority of the students at Bearfield were African-American. Regarding the staff structure, teachers outranked instructional aides and paraprofessionals were below instructional aides. Thus, Gatewood, as an IA, was between teachers and paraprofessionals in the Bearfield hierarchy.

At its heart, Gatewood's Complaint against Columbia arises from his allegations that he was wrongfully denied the opportunity to do homebound instruction for students, which paid substantially more than his IA position, and that he was belittled and harassed by Hardesty and Wilkinson because of his race. He also claims that he was not considered for the job of home school coordinator at Bearfield.

5

## A.    2001-2002 School Year

In September 2001, Gatewood interviewed with Hardesty for his IA position at Bearfield.  During the interview, Hardesty and Gatewood tossed a football and Hardesty asked him, "If I asked you to sing, would you sing for me?"  Gatewood responded that he would do whatever Hardesty told him to do.  Hardesty offered the IA position to Gatewood and, although he found Hardesty's question demeaning, he accepted the position.

When Gatewood reported for his first day of work at Bearfield as an IA, Hardesty directed Gatewood to work on the radiator of his truck.  Gatewood testified that the work took between thirty minutes and an hour.  Gatewood also observed Terry Jones ("Jones"), an African-American paraprofessional at the school, and Bearfield students cleaning the vehicles of faculty members.  Columbia states that cleaning the cars was a voluntary activity.

During a staff meeting during the school year, Hardesty commented to Gatewood that his family had owned slaves.  Hardesty made the same comment to other African-American employees at Bearfield, but he never made the comment to Caucasian employees.[2]

During another staff meeting, Hardesty asked Gatewood and Quaintance if they could arrange for a white student at Bearfield to eat in a "ghetto" home.  Gatewood took

_____

[2]Hardesty made his comments to Mary King ("King") and Hope Quaintance ("Quaintance"), both of whom are African-American and former employees at Bearfield.

offense to the comment. In his deposition, Hardesty denied making the statement, but Quaintance's deposition testimony and her journal entry that was created contemporaneously, state that he made such a request. Caucasian employees at Bearfield testified that Hardesty never asked them to arrange for a student to visit a "ghetto" home.

### 1.   *Home School Communicator Position*

Halfway through the 2001-2002 school year, Hardesty appointed Mark Consiglio ("Consiglio") to serve as the home school communicator for Bearfield.[3] Consiglio was a paraprofessional, which was a lower position than an IA, and he was Caucasian. However, it was Consiglio who approached Hardesty and suggested that Bearfield should have an employee who was responsible for re-integrating students into their home school environment. Consiglio volunteered for the work and Hardesty agreed it was a good idea. After Consiglio was given permission to take on the additional work of home school communicator, Consiglio continued to perform his regular paraprofessional job duties.

As part of his new job duties, Consiglio would contact the principal at a student's home school and look for opportunities to allow that student to participate in non-classroom school activities (i.e., assemblies, lunch periods, etc.) so the student would maintain a connection with the home school. Consiglio testified that he was not aware of a comparable position at other schools.

---

[3]The parties dispute the proper title for this position. Gatewood states that it was a home school communicator while Columbia states it was a transition coordinator. In light of the Court's obligation to view facts in favor of the non-moving party, it will refer to the position as a home school communicator.

Prior to Hardesty's appointment of Consiglio, the home school communicator position at Bearfield was not posted nor had Hardesty accepted applications for the position. Instead, Hardesty announced Consiglio as his choice. Quaintance noted in her journal that the position had not been posted. Subsequently, after Gatewood expressed frustration about not having the opportunity to apply for the position, Hardesty did post it, but it had already been filled by Consiglio. The parties dispute whether Consiglio had any college hours, but it is uncontested that he had fewer college hours than Gatewood.

The parties also dispute whether Consiglio received a pay increase after his appointment to the position. Gatewood states that the home school communicator was paid approximately 70% of a teacher's salary, which was substantially more than Gatewood's hourly wage. However, in his opposition to Columbia's Motion to Summary Judgment, Gatewood does not cite to any facts in the record to support his claim; instead, he cites only his responses to Columbia's interrogatories. His responses reference a memorandum allegedly drafted by Laffey, but Gatewood does not identify where that memorandum is located. On the other hand, Columbia offers the deposition testimony of Consiglio who stated that he did not receive a salary increase when he began performing the extra duties of a home school communicator.

The parties agree that Consiglio was provided an office with a computer and a telephone so he could perform his additional job duties.

**B.    2002-2003 School Year**

      ***1.    Wilkinson***

8

During the 2002-2003 school year, Gatewood states that Wilkinson made several inappropriate race-related comments. Gatewood states that Wilkinson implied that Gatewood should know where the prison in Boonville is because of his race; Wilkinson told a Caucasian teacher in Gatewood's presence that she was "tanning as if [she was] trying to be black;" and Wilkinson once asked Gatewood if he did not like to attend staff meetings because he was the only African-American participant. Gatewood also alleges that Wilkinson would spy on him and scrutinize his work more carefully than unidentified Caucasian employees.

Gatewood reported Wilkinson's conduct to Hardesty and Hardesty asked whether Gatewood was "looking for stuff." Hardesty did not conduct an investigation into Gatewood's allegations nor did he advise Laffey or Cowherd of the allegations. Subsequently, Wilkinson wrote up Gatewood, although the reason for the disciplinary memorandum is unknown because neither party explains why Gatewood was written up or cites where in the record the memorandum can be found. After being written up by Wilkinson, Gatewood contacted Laffey and reported that he believed Wilkinson was writing him up because of racism. Laffey did not offer to help Gatewood or initiate an investigation; instead, she instructed him to air his grievance about Wilkinson with Hardesty. In addition, Laffey advised Gatewood that he could file a written objection to the disciplinary memorandum, which he did not do.

## 2. *Hardesty*

After Gatewood was written up by Wilkinson, new problems began to develop

9

between him and Hardesty. Hardesty advised Gatewood that he was incurring excessive absences and he attached a memorandum to Gatewood's annual evaluation indicating that his absences were a problem. The memorandum was written in May 2003. Hardesty also notified Laffey of Gatewood's attendance problems. Gatewood states that his absences did not exceed the number allowed by Columbia's policy, but Columbia disputes that contention. Gatewood also alleges that unidentified Caucasian employees were not written up for excessive absences. Neither party, however, has provided written evidence of Columbia's absentee policy or the number of Gatewood's absences compared to absences by other similarly situated Caucasian employees.

Prior to writing Gatewood up for excessive absences in May 2003, Hardesty had warned Gatewood in writing about leaving Bearfield early without notifying Hardesty. In April 2003, Gatewood had to leave work early to attend a teacher meeting for his son. He left early and Hardesty issued him a written warning indicating that Gatewood was to consult with Hardesty before he left the premises early. Hardesty wrote up Gatewood even though Gatewood had provided a note from his son's teacher indicating that he was attending a parent-teacher meeting. After Hardesty wrote him up, Gatewood contacted Laffey to complain about Hardesty, but Laffey did not acknowledge his complaint.

Finally, on the next to last day of the 2002-2003 school year, Gatewood reported to Bearfield and observed a staff meeting in progress. Gatewood states that all the other staff members were in the meeting, but Columbia states that there were only teachers in the meeting and that neither IAs nor paraprofessionals were in the meeting. When

10

Gatewood arrived, Hardesty instructed him to sweep and clean a storage room that had been renovated. Gatewood left the meeting and began sweeping, but he eventually grew frustrated and left the Bearfield premises.

After Gatewood left, Hardesty contacted Laffey who in turn contacted Gatewood. When Gatewood told Laffey that he believed sweeping the floor was evidence of Hardesty's racism, she cut him off and directed him to contact Hardesty. Gatewood then contacted Hardesty and he agreed to allow Gatewood to come back to work.

### C. 2003-2004 School Year

Gatewood states that during the entire 2003-2004 school year, Hardesty required that he prepare and submit lesson plans, even though that was normally a teacher's responsibilities. Gatewood states that no one would review the lesson plans and that it was a meaningless task. Gatewood also states that Caucasian members of the support staff did not have to prepare lesson plans, but Columbia presented evidence that Valerie Batson ("Batson"), another IA at Bearfield, also had to submit lesson plans during the 2001-2002 school year. Batson is Caucasian.

At the conclusion of the 2003-2004 school year, Hardesty told Gatewood he was a "black role model."

Subsequently, Gatewood requested a transfer away from Bearfield. According to Gatewood, he was told that his request was too late and it was denied.

In a sworn statement given by Gatewood on July 30, 2004, Gatewood, when asked about Dr. Hardesty, said under oath:

11

I think he did a great job with what he had to deal without there. You know
he did a wonderful job. We have differences but we talked about it. Maybe
I was reading too much into it, you know. And we have always worked it
out, you know. And he always kept his door open for me to come talk to
him, which at times it was the hardest thing for me to do was to go talk to
him but I had to grow out of that, you know. Because if it wasn't for Dr.
Hardesty I wouldn't be out there now.

This statement was given in another lawsuit which had been filed against Columbia by

Gatewood's co-worker. It was made before Gatewood retained a lawyer and filed this

lawsuit.

### D.    2004-2005 School Year

Gatewood was transferred to Field Elementary School ("Field") during the 2004-

2005 school year. Most of Gatewood's complaints regarding the 2004-2005 school year

relate to the assignment of homebound instruction which is discussed below.

### E.    Gatewood's Ongoing Complaints

In addition to the specific complaints of discrimination which have already been

discussed, Gatewood testified about the following events which, according to him, were

not limited to one particular school year.

#### 1.    *Gatewood Performing Janitorial Duties*

Gatewood complained that he was forced to sweep the floors and wash dishes

during his entire term of service at Bearfield. According to the deposition testimony of

Jane Daniels ("Daniels"), a Caucasian paraprofessional at Bearfield, she also washed

dishes in the kitchen area. Consiglio also testified during his deposition that he swept the

floor and washed dishes in the staff breakroom in order to keep it clean. However,

12

according to Gatewood, neither of these employees were ever required to do janitorial work by Hardesty or Wilkinson.

### 2. Keys to the Office

Gatewood also complained that he was never given a key to the front office so he could access the photocopy machine. Moreover, Gatewood states that other African-American employees, including King (a teacher) and Quaintance (a paraprofessional), were also never given a key. In contrast, Gatewood observed that unidentified Caucasian employees at all levels, including paraprofessionals, were provided keys to the front office so they could access the photocopy machine. Columbia disputes that King was a teacher. It also disputes that Caucasian paraprofessionals and IAs had keys to the office. According to Columbia, only Hardesty, Wilkinson, and the secretary had a key to the front office. The parties do not dispute that the photocopy machine was moved out of the office and into the hallway in 2002.

### 3. Access to Computers

Gatewood also alleges that he and other African-American staff members, including King, were not given access to computers or passwords to gain access to the school's calendar or work-related e-mail. In addition to himself and King, Gatewood alleged that Dustin Murray ("Murray"), an African-American paraprofessional, also did not have access to a computer. In contrast, Gatewood alleged that he observed unspecified Caucasian members of the staff, including paraprofessionals, had access to their own computers and they were all provided passwords. Gatewood asked Hardesty

13

about getting a computer or access to one and Hardesty indicated that Gatewood did not need a computer.

Columbia provided evidence that computers were available for the use of all faculty in the student computer laboratory and that individual faculty members did not have their own computers. Instead, each classroom had a computer and staff members accessed those, but the computers were not designated for use by any particular staff member.

Eventually, Gatewood was provided a password, but it did not work. When he reported the problem with his password to Hardesty, Hardesty, according to Gatewood, took no action to correct the problem.

### 4. Lunch Schedules

Gatewood alleges that he never had a formal lunch period during his entire time at Bearfield, even though unidentified Caucasian employees did have set lunch schedules. Additionally, Gatewood alleges that neither King nor Quaintance ever received formal lunch schedules either.

### 5. Homebound Assignments

#### a. Homebound Assignment Background

Columbia's Department of Special Services facilitates homebound instruction for students who need it. Despite its name, homebound instruction can be performed in any appropriate locale, including the school. Pursuant to Columbia's policy, the student's parent must be present during the homebound instruction. Scheduling homebound

14

instruction time is flexible and the instructor selects when it will occur. Hardesty testified that there was always a shortage of homebound instructors at Bearfield.

The parties dispute Columbia's criteria for selecting homebound instructors. According to Gatewood, the only criteria is the instructor's certification status as a teacher or as a substitute teacher and not whether the individual has a bachelor's degree. Clippard's testimony appears to comport with that understanding, as does the application for homebound instructors, which does not indicate that a degree is required and instead inquires only about the applicant's certification status. The application states, "A homebound teacher must hold either a valid Missouri teaching certificate or have a current Missouri substitute teaching certificate on file with the [Columbia] substitute office." *See* Pl. Ex. 41 at p. 1436.

Compared to Gatewood's normal hourly wage, a homebound instructor's job is lucrative because they earn $19.30 per hour, while Gatewood's hourly wage never exceeded $11.94 per hour.

Columbia does not dispute that Gatewood satisfied the eligibility requirements to be a homebound instructor because he was a certified substitute teacher. However, Columbia presented evidence that it had an unofficial policy of favoring candidates for homebound instruction who had bachelor's degrees and were certified classroom teachers. Columbia never advised Gatewood that it preferred individuals with bachelor's degrees who were certified as classroom teachers.

Prior to the 2003-2004 school year, Hardesty handled homebound assignments at

15

Bearfield. In the 2003-2004 school year, Clippard took over this responsibility, but she still relied considerably on Hardesty's recommendations. According to the deposition testimony in the record, building principals would recommend to Clippard those employees they believed should be assigned to homebound instruction. Clippard would then review the nominee's file to check for a criminal history or some other disqualifying factor and then, barring the existence of some disqualifying factor, she would assign the person homebound instruction. Thus, Clippard relied almost exclusively on the recommendations of building principals, including Hardesty.

### b. 2003-2004 Homebound Assignments

Gatewood began requesting homebound instructor assignments at the beginning of the 2003-2004 school year. Gatewood submitted a Homebound Instructor Application and he did not state in it that he had a preference regarding a student's age or race. Clippard, however, testified that Gatewood expressed a desire to provide homebound instruction only to African-American, male students.

During the 2003-2004 school year, Gatewood did not believe he was being assigned to a sufficient number of homebound instruction opportunities. He contacted Laffey to complain that Hardesty was not recommending him for more opportunities and he believed it was racist. Laffey instructed Gatewood to take up the issue with Hardesty.

In one incident, Hardesty indicated that he would not assign Gatewood to do homebound instruction with an African-American female student because he was concerned about the possibility of gossip, even though the student's parent would be in

16

the same room during the instruction. There is evidence, however, that Hardesty assigned Thad Johnson ("Johnson"), a Caucasian, male instructor, to do homebound instruction with female students.

Gatewood also offers that during an October 2003 staff meeting, Hardesty offered homebound assignments to two Caucasian employees: Todd Koppinger ("Koppinger") and Richard Kuster ("Kuster"). According to Gatewood, neither employee had filled out a homebound instructor application and Koppinger had been at Bearfield for only one month prior to being assigned by Hardesty. After the staff meeting, Gatewood discussed the issue with Hardesty.

After the staff meeting, Gatewood contacted Clippard to report what he believed was a discriminatory method of assigning homebound instructor opportunities. According to Gatewood, Clippard referred him back to Hardesty. Clippard passed on Gatewood's report to Laffey. In what appears to be a phone log, Clippard noted that Gatewood felt discriminated against and she memorialized their conversation. *See* Pl. Ex. 19. She also sent Gatewood a memorandum advising him to speak with Hardesty. *See* Pl. Ex. 20. Neither Laffey nor Clippard initiated an investigation into Hardesty's allegedly discriminatory system of designating homebound instructor positions.

Later in October 2003, Gatewood contacted Clippard again to find out if there were any available homebound instructor opportunities. Clippard advised him there were none.

Gatewood states that several Caucasian employees who were less qualified than he

17

were given homebound assignments during the 2003-2004 school year. He points to: (1) Barb Materer, a Caucasian employee who did not have substitute certification during the 2003-2004 school year, who was assigned to homebound instruction; (2) Danna Jones-Fagot, a Caucasian employee who did not have substitute certification during the 2003-2004 school year; and (3) Johnson, a Caucasian employee who did not have substitute certification during the 2003-2004 school year because his certification expired in 2000.[4] Regarding Johnson, he was assigned homebound instruction twice in early September 2003, even though he was not certified, but he renewed his certification in late September 2003.

Additionally, Gatewood points out that Hardesty's wife was given homebound instruction in excess of 200 hours during the 2003-2004 school year, at the direction of Hardesty. Hardesty's wife was not an employee of Columbia when her husband recommended her for homebound instruction, and she did have a bachelor's degree in horticulture.

According to Columbia's evidence, Gatewood received in excess of 100 hours of homebound instruction during the school year and Gatewood does not present evidence to dispute that fact.

---

[4]Gatewood also states that Johnson had a criminal record for assault and marijuana, but his convictions were for misdemeanors and they were not felony convictions that would disqualify him for homebound assignments under Columbia's policy. Moreover, Columbia contends that it was unaware of Johnson's criminal background when it assigned him to do homebound instruction, and Gatewood has presented no evidence to show that they were aware of Johnson's criminal background at that time.

18

One of Columbia's reasons for not offering Gatewood more homebound instruction assignments is that he was a full-time worker at Bearfield who would have only one hour a day to commit to homebound instruction.[5] Thus, as a result of his full-time status, Gatewood was ineligible for several homebound instruction assignments because additional homebound instruction time would have earned him overtime under the Fair Labor Standards Act ("FLSA").

Gatewood submits that Columbia did allow full-time Caucasian employees to do homebound instruction assignments. Gatewood points to: (1) Patrick Belgan, a Caucasian full-time paraprofessional who was assigned homebound instruction, and (2) Jerilyn Helgeland, a Caucasian full-time paraprofessional who also was assigned homebound instruction.

Gatewood also submits that he was never told that the FLSA was the basis for denying him homebound instruction assignments until August 2004.

In his brief, Gatewood points out several Caucasian individuals who were allegedly assigned to homebound instruction and given preferential treatment over Gatewood. The following graph outlines the homebound instruction hours performed by the employees identified by Gatewood during the 2003-2004 school year, which consists of the time period from August 2003 through May 2004. The graph is based on a form submitted by Columbia in its Reply brief.

_____

[5]It is undisputed that Gatewood worked seven hours a day as an IA, thus leaving one hour in every workday for him to perform other duties as necessary, including homebound instruction.

| NAME | RACE | NUMBER OF HOMEBOUND HOURS |
|------|------|---------------------------|
| Gatewood | African-American | 111.50 |
| Jerilyn Helgeland | Caucasian (FT)[6] | 148.66 |
| Patrick Belgan | Caucasian (FT) | 1.25 |
| Barbara Materer | Caucasian | 96.5 |
| Thad Johnson | Caucasian | 497.26 |
| Danna Jones-Fagot | Caucasian | 39 |
| Pat Hardesty | Caucasian | 169.45 |

### c.     Summer 2004 Homebound Assignments

At the end of the 2003-2004 school year, in May 2004, Gatewood again contacted Clippard to ask that he be considered for homebound instruction assignments during the upcoming summer break.

In early May, Gatewood sent an e-mail to Clippard asking her to keep him in mind and she advised that he was on her list.  On the same day, Clippard assigned Danna Jones-Fagot, a Caucasian paraprofessional with no certification, to a homebound instruction assignment.  A few days later, Clippard assigned Donna Strnad, a Caucasian IA, to a homebound instruction assignment.  Clippard also gave homebound instruction assignments to Johnson during May 2004.

On June 3, 2004, Gatewood again contacted Clippard requesting that she consider him for homebound instruction assignments.  Records reveal that during June 2004,

---

[6]The designation (FT) indicates that these are the full-time employees that Gatewood asserts received homebound instruction assignments.

Clippard assigned several Caucasian employees to homebound instruction assignments, including Johnson and Danna Jones-Fagot. Among them was Andrea Michiniok, a Caucasian employee who had no certification of any sort. Another was Jaime Edwards, a Caucasian paraprofessional. It is undisputed that Gatewood did not receive any homebound instruction assignments during Summer 2004.

There is no evidence in the record that there were classes at Bearfield during the summer of 2004 or that Gatewood continued to perform his IA duties during the summer break.

### d. 2004-2005 Homebound Assignments

Gatewood transferred from Bearfield to Field at the beginning of the 2004-2005 school year. He was undisputedly not given any homebound instruction assignments during this school year, even though he contacted Clippard at the beginning of the school year to request that he be considered for them.

At Field, Gatewood took on extra student supervisory responsibilities in addition to his IA duties, which required him to work a full day. Laffey advised Gatewood he would have to drop his additional supervisory duties and he agreed to do that if he could obtain homebound instruction assignments. However, Gatewood continued to work in his role as a supervisor.

Gatewood contacted Clippard several more times during the 2004-2005 school year, but he was not assigned to any homebound instruction opportunities. Gatewood identified several Caucasian employees who were assigned to do homebound instruction

21

during the 2004-2005 school year, including a few who appeared to work full-time. The Court will not recount all those individuals, but some of them were paraprofessionals and some of them had been hired by Columbia after Gatewood. The number of homebound instruction hours performed by these individuals is not before the Court. Gatewood cites only to the individuals' personnel files, but the files do not contain a concise summary of the homebound hours worked, and neither party has provided the Court with such a summary.

### F.    Other Statements by Hardesty

#### 1.    *King*

Gatewood also offers the testimony of King, who was another African-American employee at Bearfield. King testified that Hardesty once referred to Gatewood and Murray as his "big black bucks" and "my boys." This exchange allegedly occurred during the same time that Hardesty told King that his family used to own slaves.

More generally, King testified she often heard Hardesty make comments related to race, including using the word "nigger" in her presence and inquiring whether she ever dated Caucasian men. He also inquired about whether she had Caucasian in her heritage because she was light-skinned. It is not clear whether these statements were made in Gatewood's presence.

King alleges that she reported Hardesty's conduct, but according to King, Columbia never conducted an investigation into her complaints.

Like Gatewood, King also alleges that she was denied homebound instruction

Case 2:04-cv-04319-NKL   Document 90   Filed 02/03/06   Page 22 of 48

assignments, even though she had a master's degree and she is certified.

### 2. Hardesty's Comments About Students

In addition to his comments to King, there is evidence that Hardesty made comments about the student body at Bearfield, which was predominantly African-American. Gatewood testified that he heard Hardesty refer to a black student as a "crack baby" and he once commented, "This is what happens when white women mess with black men." King also testified that she heard Hardesty refer to black students as "crack babies."

King testified she heard Hardesty refer to an African-American elementary school student as a "pickaninny." She also heard him refer to black students as "the slaves," "the Jezebels," and the "ghetto kids."

### G. Gatewood's Complaint

In his Complaint, Gatewood submits four counts against Columbia as follows: Count I is for race discrimination in violation of 42 U.S.C. § 1981; Count II is for hostile environment in violation of 42 U.S.C. § 1981; Count III is for retaliation in violation of 42 U.S.C. § 1981; and Count IV sets forth a claim under 42 U.S.C. § 1983 for a violation of Gatewood's equal protection rights [Doc. # 3]. Columbia moves for summary judgment on all four counts of Gatewood's Complaint.

## III. Discussion

### A. Gatewood's Race Discrimination Claim

Courts apply the familiar burden-shifting framework initially set forth by the

Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Once plaintiff makes out a *prima facie* case, there is a presumption of discriminatory conduct by the employer. Then the burden of production shifts to the employer to present a legitimate, non-discriminatory reason for its conduct. *Haas v. Kelly Services, Inc.*, 409 F.3d 1030, 1035 (8th Cir. 2005) (citations omitted) (setting forth the burden-shifting framework). At this stage of the proceeding, the employer bears only the burden of production and not the burden of persuasion. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046 (8th Cir. 2005) (citing *Krenik v. County of Le Sueur*, 47 F.3d 953, 958 (8th Cir. 1995)). If the employer satisfies its burden of production, then the presumption of unlawful conduct disappears and the plaintiff is required to prove by a preponderance of the evidence that the employer's stated reason was pretext for unlawful conduct creating an inference that discrimination was the true reason.[7] *Haas*, 409 F.3d at 1035; *Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894, 897-98 (8th Cir. 2004) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004)).

### 1. **Prima Facie Case**

To establish a *prima facie* case for his two race discrimination claims, Gatewood

---

[7]The Eighth Circuit has held that this burden-shifting framework is still applicable at the summary judgment stage and that the framework was unaffected by the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148 (2003). *See Russell v. City of Kansas City, Missouri*, 414 F.3d 863, 2005 WL 1618784 at *3 (8th Cir. July 12, 2005) (citing *Griffith v. City of Des Moines*, 387 F.3d 733, 735-36 (8th Cir. 2004)); *Torlowei v. Target*, 401 F.3d 933, 934 (8th Cir. 2005).

24

must demonstrate (1) that he belonged to a racial minority; (2) he sought, and was qualified for, a position which was being filled by his employer; (3) he was rejected for the position despite his qualifications; and (4) a similarly-situated individual who was not part of the protected group was placed in the position. *Sallis v. Univ. of Minn.*, 408 F.3d 470 (8th Cir. 2005); *Pope v. ESA Services, Inc.*, 406 F.3d 1001 (8th Cir. 2005).

Gatewood claims that Columbia discriminated against him based on his race when it (1) denied him the opportunity to compete for the home communicator position at Bearfield, and (2) denied him homebound instruction assignments.

### a.   Home School Communicator

Gatewood has established a *prima facie* case of race discrimination for his home school communicator claim.  Gatewood was qualified to fulfill the duties of the Bearfield home school communicator.  Gatewood did not get the job and a Caucasian did.

### b.   Homebound Instruction Assignments

The Court also finds that Gatewood can establish a *prima facie* case of race discrimination for homebound instruction claim.  The undisputed evidence is that Gatewood was qualified for the assignments and he actively pursued them.  It is also undisputed that Columbia hired Caucasians for those assignments, even some who were less qualified than Gatewood.

### 2.   *Legitimate, Non-Discriminatory Reasons and Pretext*

As discussed below, Columbia has presented evidence of nondiscriminatory reasons for denying Gatewood the duties of home school communicator and homebound

instruction assignment.  Therefore, the burden of production and persuasion is on Gatewood to show that Columbia's explanation is pretextual.

For a plaintiff to establish the plaintiff's *prima facie* case, the plaintiff must offer only minimal evidence.  *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004); *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001).  However, in the pretext stage of a court's analysis, a plaintiff must provide substantial evidence of pretext in order to defeat a dispositive motion.  *Cherry*, 361 F.3d at 479 (emphasis added); *Sprenger*, 253 F.3d at 1111 (emphasis added).  Courts impose this higher standard at the pretext stage because the evidence is now viewed in light of the employer's justification for the adverse employment action.  *Sprenger*, 253 F.3d at 1111.

### a.  Home School Communicator

Consiglio was assigned the extra responsibilities of a home school communicator because he came up with the idea to have such a position at Bearfield and volunteered to assume those new responsibilities.  Consiglio also continued to perform his paraprofessional duties in addition to his work as a home school communicator and he did not get paid more, even though he had additional duties.

Gatewood claims that Consiglio did receive a raise, but he points to no objective evidence to support his assertion.  Gatewood points only to his response to Columbia's interrogatories, but his response does not identify any evidentiary basis for his answer to the interrogatory.  Thus, there is no basis for a jury to find that Consiglio received a tangible benefit by taking on the additional duties of a home school communicator.

26

The undisputed evidence is that Consiglio approached Hardesty about beginning a program at Bearfield to re-orient students to their home schools. Not surprisingly, given that it was Consiglio's idea, Hardesty appointed Consiglio to undertake these additional responsibilities. Gatewood has presented no evidence that someone vacated this position and Hardesty appointed Consiglio without performing a search nor is there any evidence that Gatewood had ever expressed an interest in performing that type of work. Under these circumstances, a reasonable jury could not conclude that Hardesty's failure to post the position and canvas for applications was discriminatory even if in another context Hardesty made inappropriate, but infrequent, comments about race.

The Court's finding is consistent with cases that have held that the law generally does not require that promotional opportunities be posted. In *Foster v. Arcata Assoc.*, the Ninth Circuit stated:

> Employers have no obligation to canvass their employees for preference changes before filling job openings . . . . Employees must assume responsibility for making application for positions when the position openings are known. In cases where, as here, the job opening was not announced, then the employee must demonstrate that the employer was aware of her availability for the position.

772 F.2d 1453, 1463 (9th Cir. 1985), *overturned on other grounds*; *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991). Similarly, the Eighth Circuit has held that an employer's failure to post a job vacancy alone cannot give rise to an inference of wrongful conduct unless there is some additional evidence of discriminatory animus. *See Turner v. Honeywell Fed. Mfg. & Technologies, L.L.C.*, 336 F.3d 716, 723 (8th Cir. 2003)

("[Plaintiff] presented no evidence showing that Honeywell's decisions not to post the positions and not to promote [plaintiff] were discriminatory."); *Dotson v. Delta Consolidated Industries, Inc.*, 251 F.3d 780, 782 (8th Cir. 2001) ("The mere failure to post the opening in this instance cannot give rise to a reasonable inference that the failure was racially motivated . . . .").

Moreover, the Court's finding is buttressed by the fact that Hardesty's decision to appoint Consiglio without a formal vetting process impacted all employees equally, including Caucasians who also may have been interested in applying for the position. In *Dotson*, the court noted that Delta's decision not to post the position was not discriminatory, particularly where "[a]ll of Delta's employees, regardless of race, were supplied with the same amount of information about job openings, and in the same way." *Dotson*, 251 F.3d at 782. This comports with the general rule that employment policies that are equally and neutrally applied to all employees cannot give rise to an inference of wrongful animus. *Smith v. Monsanto Chemical Co.*, 770 F.2d 719 (8th Cir. 1985) (uniform application of termination policy could not be basis for an adverse employment action); *Shaner v. Synthes*, 204 F.3d 494 (3rd Cir. 2000) (gender-neutral application of employment policy did not give rise to discriminatory inference in Title VII context) (citations omitted).

A reasonable jury could not conclude that Hardesty's conduct was discriminatory with respect to the home school communicator position because it was Consiglio's idea to add the duties to his already-existing position, and the decision to appoint Consiglio

28

without first posting the position was equally disadvantageous to employees of all races at Bearfield. Therefore, the Court grants Columbia's Motion on this issue.

### b.     Homebound Instruction Assignments

#### (i)     2003-2004 School Year

Gatewood performed 111.50 total hours of homebound instruction during the school year, but he claims Columbia discriminated against him because it did not give him more hours.

Columbia asserts that Gatewood was not given additional homebound instruction assignments during the 2003-2004 school year because to do so would have required overtime compensation under the FLSA. This was because Gatewood was already working seven hours a day as an IA, so he was available for homebound instruction only one hour a day before the FLSA overtime requirements were triggered.

In an effort to undermine Columbia's reliance on the FLSA, Gatewood points to several Caucasian employees who were also assigned homebound instruction during the 2003-2004 school year. However, most of the individuals identified by Gatewood were not full-time employees. To be similarly situated to Gatewood, the employees in question "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Tolen v. Ashcroft*, 377 F.3d 879, 882 (8th Cir. 2004) (citations omitted). It is undisputed that most of the comparator employees identified by Gatewood were part-time and therefore not subject to the same FLSA restrictions as Gatewood. Thus, Gatewood

29

cannot rely on them to establish pretext.

Of the employees identified by Gatewood, only two of them were full-time and therefore subject to Columbia's policy regarding overtime compensation: Jerilyn Helgeland and Patrick Belgan. Belgan had substantially fewer homebound instruction hours during the 2003-2004 school year than Gatewood and his assignments cannot create an inference of pretext because Gatewood was treated better than he was.[8]

Regarding Helgeland, she had 37.16 hours more than Gatewood of homebound instruction during the 2003-2004 school year. A review of Helgeland's records reflects that she often performed homebound instruction from 3:00 to 5:00 in the afternoon and had two hours per day available for homebound instruction while Gatewood undisputedly had only one hour per day available for homebound instruction. Thus, her additional hours appear to be the result of a more conducive work schedule rather than discrimination and she is not a comparable employee because her better work schedule constitutes a "distinguishing circumstance[]." *Tolen*, 377 F.3d at 882. Gatewood has not offered evidence to the contrary nor has he submitted any evidence that Columbia had to pay Helgeland overtime compensation to perform homebound instruction.

No reasonable jury could find that Helgeland's record demonstrates that Columbia lied when it said that Gatewood was receiving fewer homebound instruction during the 2003-2004 school year because of the FLSA. Helgeland did not have substantially more

---

[8]Belgan had 1.25 hours during the entire 2003-2004 school year while Gatewood had in excess of 100 hours.

hours than Gatewood, her work schedule allowed her more time to do homebound instruction, and there is no evidence she was paid overtime in violation of Columbia's stated preference for avoiding overtime.

### (ii)    Summer 2004

It is undisputed that Gatewood pursued opportunities to perform homebound instructions during the 2004 summer break.  Despite his efforts, he was assigned no homebound instruction hours after May 2004, even though Columbia employees were assigned to perform over 230 homebound instruction hours in June 2004 alone. Columbia's reliance on the FLSA appears to have no merit regarding Summer 2004 because Columbia has presented no evidence that Gatewood was working full time during the summer.  Thus, based on the evidence before the Court, it appears that Gatewood was able to perform homebound instruction during the summer without any concerns about the FLSA and Columbia's reliance on the FLSA cannot be the basis for granting summary judgment.  At a minimum, Columbia has failed to present evidence that would justify its assertion that it denied Gatewood homebound instruction assignment during that summer because it did not want to pay him overtime.

Columbia does offer two other reasons for not assigning Gatewood to homebound instructions: its preference for homebound instructors who had bachelor's degrees and Gatewood's preference for performing homebound instruction for African-American students.

As to Columbia's preference for homebound instructors with bachelor's degrees, a

31

reasonable jury could conclude that this reason is pretext based on the number of Caucasian employees who did not have bachelor's degrees, but were assigned homebound instruction. Only a few of the individuals identified by Gatewood had bachelor's degrees and, in many respects, Gatewood had more college training and a higher certification level than those who were selected.

As to Columbia's assertion that Gatewood was not given more homebound instruction assignments because he specifically asked to teach only African-American students, this hinges on a material issue of fact that is in dispute and cannot be resolved at the dispositive motion stage. Gatewood denies that he ever expressed such a preference and Columbia offers no evidence to support its assertion. Allegedly Gatewood made the statement to Clippard, but Gatewood vehemently denies the allegation and his application for homebound instruction does not appear to indicate any preference. This is an issue of disputed fact that precludes summary judgment.

On this record, Gatewood was available for homebound instruction during Summer 2004 and he expressed an eagerness to perform such instruction, and in light of the fact that several Caucasian employees, some of whom appear less qualified, were given the assignments in lieu of Gatewood**,** a reasonable jury could find that Columbia denied Gatewood an opportunity to perform homebound instruction during Summer 2004, based on his race. Similarly, a reasonable jury may determine that Columbia's stated reasons for passing over Gatewood were pretextual because there is no evidence to show that the FLSA was an issue during Summer 2004. Accordingly, the Court denies

32

Columbia's Motion as it relates to Summer 2004 homebound instruction assignments.

### (iii)    2004-2005 School Year

At the commencement of the 2004-2005 school year, Gatewood transferred to Field where he continued to work seven hours a day as an IA.  Gatewood also accepted additional responsibilities of supervising students and his additional duties consumed the one hour a day that Gatewood previously had available to perform homebound instruction.

When Gatewood contacted Laffey about obtaining homebound instruction assignments during the 2004-2005, Gatewood stated that he would drop his additional duties so he could return to performing homebound instruction one hour per day.  While it is undisputed that Gatewood told Laffey he would discontinue his additional duties, Gatewood continued to perform his additional duties, thereby making him ineligible for homebound instruction assignments because those additional hours would trigger overtime compensation.

Gatewood again points to several Caucasian employees who were given homebound instruction during the 2004-2005 school year.  However, Gatewood identifies only one of those individuals who was a full-time employee--all the rest were part-time and therefore not comparable to Gatewood.  *See Tolen*, 377 F.3d at 882.  Joyce Moore ("Moore") was the only other full-time employee that Gatewood identified and she performed 11.45 hours of homebound instruction during the 2004-2005 school year, all of

Case 2:04-cv-04319-NKL   Document 90   Filed 02/03/06   Page 33 of 48

which occurred between January 7, 2005, and January 13, 2005.[9]  Thus, Moore's

assignment to homebound instruction was very finite in time and her hours were *de*

*minimis* such that they cannot create an inference of race discrimination, especially where

Gatewood's employment schedule precluded him from performing homebound

instruction.

Gatewood also points to other employees who performed homebound instruction

during the 2004-2005 school year in one-hour increments.  Gatewood was available to do

one-hour homebound instruction meetings during the 2003-2004 school year because he

worked only seven hours a day.  However, his argument is inapplicable for the 2004-2005

school year because he worked 7.5 hours a day during that year due to his additional

responsibilities--thus, Gatewood was no longer eligible for even a one-hour homebound

assignment and no reasonable jury could look to other one-hour assignments as proof of

pretext.

### B.    Gatewood's Claim for Hostile Environment

To establish a hostile work environment based on a plaintiff's race, the plaintiff

must prove that: (1) the plaintiff was a member of the protected group; (2) the plaintiff

was subjected to unwelcome race-based harassment; (3) the harassment was because of

the plaintiff's membership in the group; (4) the race-based harassment affected a

---

[9]It's not even clear that Moore was full-time when she performed these hours.  It appears
from her personnel file that she started as a part-time employee and at some point became a full-
time paraprofessional, but it is unclear from her personnel file when that switch occurred and
Gatewood does not state when it occurred.

condition, term, or privilege of the plaintiff's employment; and (5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. *Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796 (8th Cir. 2003); *Elmahdi v. Marriott Hotel Services, Inc.*, 339 F.3d 645 (8th Cir. 2003).

The environment must be objectively hostile to a reasonable person and subjectively hostile to the victim. *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005). The conduct at issue "must be extreme and not merely rude or unpleasant." *LeGrand v. Area Resources for Community & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 335 (2005) (citations omitted); *Sallis*, 408 F.3d at 477 ("rude" or "insensitive" conduct insufficient to support a claim for hostile environment). To determine if a work environment is hostile or abusive, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sallis*, 408 F.3d at 477 (citing *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003)).

### 1. *Hardesty's and Wilkinson's Comments*

The Court agrees with Columbia that Hardesty's and Wilkinson's comments do not constitute a hostile work environment. Although the two men made racially-charged comments, they were isolated in nature and they were not sufficient to sustain a finding of a hostile work environment. *See Klein v. McGowan*, 198 F.3d 705, (8th Cir. 1999) ("Simple teasing, offhand comments, and isolated incidents generally cannot amount to

35

severe or pervasive harassment."); *Scusa v. Nestle U.S.A. Co.,* 181 F.3d 958 (8th Cir.

1999) (more than a few isolated incidents are required). Given the current case law of the

Eighth Circuit, the comments made by Hardesty and Wilkinson were insufficient.

### 2. *Work Conditions*

Gatewood also alleges that the work conditions at Bearfield constitute a hostile

work environment. Specifically, he points to alleged ongoing problems, including his

lack of access to keys to the office, his lack of access to a computer with a password, his

lack of a formal lunch period, and his janitorial assignments.

### a. Janitorial Duties

There is evidence that Caucasian employees at Bearfield also washed dishes and

swept floors thereby undermining Gatewood's claim that he was somehow mistreated.

Moreover, Gatewood merely states that he was forced to engage in this conduct "all the

time," but does not identify specific dates. He does not offer evidence about the

approximate number of times he was forced to wash dishes nor does he state

approximately how many times he was required to sweep floors. The only incident in the

record was when Hardesty asked Gatewood to sweep the floor of the newly-renovated

storage room at the end of the 2002-2003 school year, but this incident is insufficient

because it is isolated in nature. *Scusa*, 181 F.3d at 958 (more than a few isolated

incidents are required).

Even assuming that Gatewood could establish that he was frequently asked to

wash dishes or sweep the floor, it is uncontested that he did not receive any diminution in

36

his pay, title, or benefits. Thus, Gatewood was essentially dissatisfied with his work assignments and such dissatisfaction, particularly where the assignments are temporary in nature, cannot form the basis of a hostile work environment claim. *See Tuggle v. Mangan*, 348 F.3d 714 (8th Cir. 2003) (assigning electrician to perform janitorial duties, even when combined with offensive comments, does not constitute hostile work environment) (citing *DeNovellis v. Shalala*, 124 F.3d 298, 311 (1st Cir. 1997) (scattered race comments combined with job assignments below plaintiff's qualifications were not severe or pervasive to constitute hostile work environment); *Casiano v. AT&T Corp.*, 213 F.3d 278, 285 (5th Cir. 2000) (assigning plaintiff demeaning tasks does not constitute a hostile work environment)). Given the lack of specificity in Gatewood's assertions and the fact that menial tasks alone cannot constitute a hostile work environment, the Court finds that Gatewood's allegation regarding janitorial duties is insufficient to establish that a hostile environment existed and that the alleged mistreatment was pervasive.

### b.     Keys to the Office

Gatewood also alleges that he was denied keys to the office and that this supports his claim for a hostile work environment. According to Gatewood, he was denied access to the photocopy machine because he did not have a key to the office and that impacted his ability to perform his job duties.[10]  However, it is undisputed that the photocopy

---

[10]In his brief, Gatewood also alleges that he was denied the opportunity to obtain supplies because he did not have a key to the office. However, during his deposition, he testified that photocopying was the only reason he would need to enter the office.

machine was moved out of the office and into the hallway in 2002, thereby making it accessible to everyone.  Gatewood also admitted that he never asked Hardesty for a key to the office and that he never complained about it.  When the secretary was in the office, it was open and accessible to Gatewood.

Given that Gatewood started at Bearfield in Fall 2001 and that his limited access to the copy machine ended in 2002, the conduct was not frequent enough to establish a hostile work environment that altered a "condition, term or privilege" of Gatewood's employment.  *Diaz*, 318 F.3d 796; *Elmahdi*, 339 F.3d 645.  The undisputed evidence is that Gatewood was able to satisfactorily complete his job duties, even though the photocopy machine was sometimes behind a locked door.  *See Stuart v. General Motors Corp.*, 217 F.3d 621, 632-33 (8th Cir. 2000) (employee's ability to continue to perform her job duties and show up for her assigned shifts negated her claim of hostile work environment).  At worst, it appears that, for a time, Gatewood was inconvenienced because he had to schedule his photocopying for when somebody was in the office. Inconvenience alone, however, is insufficient to establish a violation of federal employment statutes.  *See Sallis*, 408 F.3d at 476 (in disparate treatment context, inconvenience does not constitute a change in an employee's workplace conditions so as to give rise to an adverse employment action) (citing *Cruzan v. Special Sch. Dist., # 1*, 294 F.3d 981, 984 (8th Cir. 2002)).  Thus, because the placement of the photocopy machine did not alter a condition of Gatewood's employment, it cannot give rise to a claim for a hostile work environment.

In light of the foregoing, Gatewood's temporary inability to access the photocopy machine cannot establish a hostile work environment.

### c. Computers

Regarding Gatewood's access to computers, he points to several other Bearfield employees who allegedly had their "own" computers. However, the evidence demonstrates that each classroom at Bearfield had a computer in it and that the individuals identified by Gatewood obtained access by virtue of being in the classroom-- not by having a specific computer that was designated specifically for them alone. The deposition testimony reflects that multiple people had access to the same computer and there is no evidence that Gatewood was ever denied access to these or other computers. Gatewood points to Consiglio's access to a computer, but that was for his duties as a home school communicator and the evidence reflects that the computer was initially for the use of all staff--not just Consiglio. Gatewood also points to Batson, but she had access because she was acting as the teacher in the classroom that contained the computer and it appeared that Gatewood could also have accessed the same computer. Gatewood also points to another paraprofessional, but the evidence reflects that she was simply using the computer that was already in the classroom.

Ultimately, Gatewood's claims that other employees were given access to specific, personal computers are based on conclusory statements that are not supported by the record and these statements are insufficient to raise a genuine issue of fact that defeats summary judgment. *See Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 683-84 (8th

39

Cir. 2001) (conclusory statements by a plaintiff are not sufficient to make a submissible case). *See also Jeseritz v. Potter*, 282 F.3d 542, 547 (8th Cir. 2002); *Miller v. Citizens Sec. Group, Inc.*, 116 F.3d 343, 346 (8th Cir. 1997). The evidence outlined above is directly contrary to Gatewood's conclusory assertions and Gatewood offers only conclusory statements in opposition. Therefore, there is no basis for a reasonable jury to conclude that Gatewood was denied access to a computer because of his race.

In addition to failing to identify employees who were specifically assigned personal computers that were exclusively for their use, Gatewood admitted in his deposition that he obtained a password in the 2002-2003 school year and he had no problem accessing his e-mail. Gatewood testified that he would use the computers in the student laboratory to access his e-mail and perform other computerized work. Although Gatewood could not access the school calendar via these computers, it does not appear that was the fault of Hardesty because Gatewood was communicating directly with the Columbia computer department to obtain his correct passwords. Thus, it appears that Gatewood had access to computers, but he wanted a different form of access and that is the source of his disagreement with Columbia. However, courts do not sit as "super-personnel departments to resolve such disagreements." *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. Apr. 14, 2005) (federal courts do not have "authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."). Accordingly, this assertion cannot be the basis for a hostile

40

work environment claim.

### d. Lunch Periods

Gatewood stated in his Opposition that he did not get a formal lunch period during his entire time at Bearfield and that he "observed Caucasian employees did get a lunch period." *See* Pl. Opposition [Doc. # 62] at p. 64 ¶ 78. However, Gatewood does not identify what other Caucasian employees received lunch breaks nor does he state what level of employees (i.e., teachers, paraprofessionals, etc.) received breaks. As noted above, conclusory statements without some form of evidentiary support are not sufficient to make a submissible case. *Sowell*, 251 F.3d at 683-84; *Jeseritz*, 282 F.3d at 547; *Miller*, 116 F.3d at 346. Thus, without more evidence, Gatewood's claims cannot constitute a hostile work environment.

Moreover, in her deposition, Quaintance (African-American) stated that she was required to eat lunch with her students, which is consistent with Batson's (Caucasian) testimony that she also ate lunch with her students. Thus, according to the little evidence before the Court on this issue, it appears that employees of both races were treated equally in that they were all required to eat lunch with their students.

### e. Memorandum Regarding Absences

Finally, to the extent that Gatewood points to his disciplinary memorandum for excessive absences as evidence of a hostile work environment, that claim must fail. In the disparate treatment context, disciplinary memoranda cannot constitute an adverse employment action unless they set in motion a "series of acts by others which the actor

41

knows or reasonably should know would cause others to inflict constitutional injuries . . .

."  *Graves v. Arkansas Dep't of Finance & Admin.*, 229 F.3d 721, 723 (8th Cir. 2000);

*Darnell v. Ford*, 903 F.2d 556, 562 (8th Cir. 1990).  In Gatewood's case, there is no

evidence that the one written disciplinary memorandum for Gatewood's excessive

absences culminated in any negative consequences nor is there evidence that the

memoranda interfered with his work.

Similarly, the one memorandum constitutes an isolated incident, which also

undermines the viability of Gatewood's claim of a hostile environment.  *See Klein*, 198

F.3d 705 (isolated incidents generally cannot amount to severe or pervasive harassment);

*Scusa*, 181 F.3d 958 (more than a few isolated incidents are required).  Thus, there is no

basis for finding that the one memorandum contributed to a hostile work environment

based on Gatewood's race.

### C.    Retaliation Claim

To establish a *prima facie* case of retaliation, a plaintiff must show: (1) he engaged

in activity that is protected; (2) an adverse employment action was taken against him; and

(3) a causal connection between the two events.  *Kiel v. Select Artificials, Inc.*, 169 F.3d

1131, 1136 (8th Cir. 1999).

Gatewood asserts that he engaged in protected activity when he complained to

Laffey in the fall of 2002 that Hardesty was prejudiced.  Gatewood also points out that he

subsequently complained about Hardesty several other times during the relevant time

period.  Columbia claims that Gatewood did not complain about Hardesty until 2004, and

42

when he did, corrective action was taken. However, viewing the facts most favorable to Gatewood, the Court finds that Gatewood has produced evidence that he engaged in protected activity as early as the fall of 2002.

In addition to complaining to Columbia personnel about Hardesty, Gatewood also complained to Hardesty about Wilkinson during the 2002-2003 school year. Gatewood told Hardesty that he believed Wilkinson was prejudiced because of his comments and because Wilkinson had written him up for excessive absences. When he was initially confronted with Gatewood's allegations, Hardesty allegedly asked him if he was "looking for stuff." According to Gatewood, he complained to Hardesty about Wilkinson on three separate occasions in the early stages of the 2002-2003 school year. Moreover, there is evidence that Gatewood complained to both Hardesty and Clippard in Fall 2003 about the distribution of homebound instruction assignments and his belief that they were discriminating against him.[11]

### 1. 2003-2004 School Year

Gatewood cannot establish that he suffered an adverse employment action during the 2003-2004 school year after he engaged in protected activity. According to Gatewood's own testimony, he last engaged in protected activity in October 2003 when he complained that he was not being assigned homebound instruction hours. Gatewood had not expressed a desire to perform homebound instruction prior to Fall 2003 so his

---

[11] All of Gatewood's alleged instances of protected activity are set forth in his Opposition. *See* Doc. # 62 at pp. 126-27. The latest incident of protected activity occurred in October 2003.

43

lack of homebound instruction in the previous school years cannot serve as the basis for a retaliation claim. After Gatewood complained in October 2003, Columbia began assigning Gatewood to homebound instruction and in November 2003 he performed 24 hours of homebound instruction. Thus, immediately after Gatewood's complaint in October 2003, he did not receive an adverse employment action; instead he began to routinely receive homebound instruction assignments throughout the 2003-2004 school year. No reasonable juror could infer a retaliatory motive when Columbia responded to Gatewood's complaint by giving him homebound instruction.

The Court acknowledges that Gatewood wanted *more* homebound instruction hours than the ones he received for the 2003-2004 school year, but the appropriateness of Columbia's policy is not an issue for this Court to decide because courts do not sit as "super-personnel departments to resolve such disagreements." *Henderson*, 403 F.3d 1026, 2005 WL 850893 at *4 (federal courts do not have "authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."). Thus, Gatewood's homebound instruction hours during the 2003-2004 school year negate his claim of retaliation. Furthermore, as previously discussed, more homebound instruction hours would have triggered the FLSA overtime requirements.

### 2. *Summer 2004 and 2004-2005 School Year*

Regarding the remainder of Gatewood's employment, Columbia argues that Gatewood cannot satisfy his burden of demonstrating an adverse employment action, but

44

it offers no support for its contention. Columbia ignores the fact that failure to promote and missed opportunities to earn higher wages can constitute adverse employment actions. *Watson v. O'Neill*, 365 F.3d 609, 613 (8th Cir. 2004) (noting that missed promotions can constitute adverse employment actions); *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830 (8th Cir. 2002) (failing to promote an employee is an adverse employment action); *Gentry v. Georgia-Pacific Corp.*, 250 F.3d 646 (8th Cir. 2001) (citation omitted) (same). *See also Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (rejecting the argument that adverse employment actions occur only where the claimant is fired, demoted, or the claimant's pay is reduced). Thus, a reasonable jury may infer that Gatewood suffered an adverse employment action when he was denied homebound instruction assignments in Summer 2004 and during the 2004-2005 school year.

Although Gatewood can establish that he suffered an adverse employment action, a reasonable jury could not conclude that there is a causal link between his protected activity and that adverse action. Gatewood's last complaint occurred in October 2003 but the alleged adverse action did not occur until June 2004 (the first month Gatewood was not assigned homebound instruction hours). Thus, there was an eight-month time interval between Gatewood's last date of protected activity and the adverse employment action. Courts hold that a time interval between the protected activity and the adverse action greater than a few months cannot give rise to an inference of retaliation. *See Eley v. U.S. Dep't of Veterans Affairs*, No. 03-2782, 2004 WL 768671 (8th Cir. Apr. 9, 2004) (interval

45

of four months between protected activity and adverse action); *Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 616 (8th Cir. 2003) (interval of two months between protected activity and adverse action); *Kipp v. Missouri Highway & Transp. Comm'n*, 280 F.3d 893, 896-97 (8th Cir. 2002) (interval of two months between protected activity and adverse action). Accordingly, the intervening time period between October 2003 and June 2004 invalidates any causal connection between Gatewood's protected activity and the alleged adverse action.

Therefore, Gatewood cannot establish that his protected activity was causally linked to the alleged adverse action that he suffered at the hands of Columbia. The Court grants Columbia's Motion on Gatewood's retaliation claim.

### D.  Equal Protection Claim

Finally, Columbia moves for summary judgment on Gatewood's equal protection claim brought under 42 U.S.C. § 1983. Columbia did not brief this point in its initial Motion for Summary Judgment. In fact, Columbia specifically stated it was moving for summary judgment only on three counts. *See* Def. Motion [Doc. # 53-2] at p. 8. However, after Gatewood pointed out its error, Columbia in its Reply inexplicably stated that it indeed intended to move for summary judgment on all four counts and then briefed Gatewood's equal protection claim in its Reply brief.

Gatewood states that the Court should not consider granting summary judgment on this claim because it is time-barred. However, Gatewood ignores that employment-related equal protection claims are analyzed under the same *McDonnell-Douglas* burden-

46

shifting analysis as section 1981 and other employment claims.  *See Lockridge v. Board of Trustees of Univ. of Arkansas*, 315 F.3d 1005, 1010 (8th Cir. 2003).  Thus, the analysis set forth in the briefing on Columbia's pending Motion is equally applicable to the analysis applied above and the Court will grant Columbia's Motion on the equal protection claim to the same extent it has granted it on Gatewood's other claims.

### E. Summary

In light of the foregoing, Gatewood can maintain his claim against Columbia only for the homebound instruction assignments made during Summer 2004 and the equal protection claim that derives from that allegedly discriminatory treatment.  Gatewood has failed to offer sufficient facts for his other claims from which a reasonable jury could infer that Columbia wrongfully discriminated, harassed, or retaliated against him.

### IV. Conclusion

Accordingly, it is hereby

(1)    ORDERED that Columbia's Motion for Summary Judgment [Doc. # 53] is GRANTED in part and DENIED in part.  It is denied as to Gatewood's claims that race motivated Columbia's decision to not give him homebound instruction in the Summer 2004.  It is granted in all other respects.  It is further

(2)    ORDERED that Columbia's Motions to Strike [Docs. ## 66 and 71] are DENIED; and

(3)    ORDERED that Gatewood's Motions to Strike [Docs. ## 80 and 81] are DENIED.

Case 2:04-cv-04319-NKL   Document 90   Filed 02/03/06   Page 47 of 48

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

DATE:  February 3, 2006
Jefferson City, Missouri

48